STATE OF SOUTH DAKOTA, Plaintiff,

v.

Brock ADAMS, United States Secretary of Transportation; Karl Bowers, Federal Highway Administrator; William A. Weseman, Division Highway Administrator and The United States of America, Defendants.

No. 78–3051.

United States District Court, D. South Dakota, C. D.

April 9, 1980.

See also D.C., 506 F.Supp. 50.

Ronald G. Schmidt, Sp. Asst. Atty. Gen., Pierre, S. D., for plaintiff.

Terry L. Pechota, U. S. Atty., Sioux Falls, S. D., Judith S. Scolnick, Dept. of Justice, Edward V. A. Kussy, Deputy Asst. Chief Counsel for Right of Way and Environmental Law Division, Federal Highway Administration, Washington, D. C., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### SUMMARY

This action was brought by the State of South Dakota [State], against the United

**62**

States Secretary of Transportation [Secretary]. The State seeks to overturn the Secretary's final determination and order of November 9, 1978, because the order and determination is alleged to be arbitrary and capricious and to be based on a record not containing substantial evidence to justify it. The factual and legal background is set forth in this court's memorandum opinion in Civ. 77–3039, 506 F.Supp. 50, which deals with the constitutionality of 23 U.S.C. § 131 [The Act].

The administrative hearing from which the factual record in this case was made was held before an administrative law judge on December 12–15, 1977, at Pierre, South Dakota. The Secretary issued his final determination and order on November 9, 1978. The State commenced this action, asking for review of the Secretary's action, on December 7, 1978. Both parties have moved for summary judgment, and filed briefs and memoranda in support of their motions. The court first heard oral argument in this case on August 10, 1979, at which time the State sought and was granted leave to file an amended complaint. The State also requested and was granted permission to file supplemental briefs in support of contentions made and refined in the amended complaint. The Secretary duly responded to these briefs and to the amended complaint. At the request of the State, further argument was heard on October 19, 1979, and the parties have filed further briefs and affidavits since that time.

The court now finds and concludes that the Secretary's order is not arbitrary and capricious and that it is based on substantial evidence. The order is, therefore, affirmed.

| | PAGE |
|---|---|
| Issues Stated | 62 |
| Decision | 62 |
| **I** | |
| Scope of Review | 62 |
| **II** | |
| Whether the Record Justifies the Secretary's Determination | 63 |
| A. Introduction | 63 |
| (1) Relevant Provisions of the Highway Beautification Act | 63 |
| Decision | PAGE |
| (2) General Considerations | 65 |
| B. Whether SDCL Ch. 31–29 Complies with the Act | 65 |
| (1) Directional Signs | 65 |
| (2) Urban Areas-Municipality Distinction | 67 |
| (3) Section 131(d) Agreements | 68 |
| a. Generally | 68 |
| b. Extent of Unzoned Commercial and Industrial Areas | 69 |
| (4) The Moratorium on Directional Sign Removal | 70 |
| C. The State's Arguments Regarding Compliance | 71 |
| (1) The State's Record of Billboard Removal | 71 |
| (2) Flexibility of the Act | 71 |
| (3) Scenic Attractiveness | 72 |
| D. Whether the Secretary Abused his Discretion in Failing to Suspend the Penalty on the Fiscal Year 1978 Funds, Pursuant to 23 U.S.C. Sec. 131(b). | 72 |
| (1) Economic Impact of Compliance | 72 |
| (2) The State's Good Faith Attempt at Compliance | 73 |
| (3) Whether the Penalty Should be Suspended Because Delay in Rendering the Secretary's Decision Allegedly Caused the State Not to Adopt Complying Legislation in 1978. | 74 |
| (4) Whether the Secretary Abused his Discretion in Treating the Fiscal 1978 Funds Differently from the Fiscal 1979 Funds. | 74 |
| Conclusion | 75 |

## ISSUES

The following issues are presented by the record in this case:

I. What scope of review should be employed?

II. Does the administrative record justify the Secretary's decision and order?

## DECISION

### I. *SCOPE OF REVIEW*

■ The State has asked for a trial de novo in this court case. The exact grounds are unclear. The request, although contained in the complaint, is not pressed in the State's briefs. The State seems to reason that since the procedure employed was a denial of due process, and since the Secretary acted in an arbitrary and capricious manner, the matter should be heard de

novo. This contention is without merit. The proper remedy for any such violation would be a remand for new and untainted factfinding, rather than a usurpation of the Secretary's factfinding function by this court. There is little if anything new which the State would present to the Court on a trial de novo. Apparently, the State seeks to have this court substitute its judgment on the factual issues for that of the Secretary. There is no statutory provision for such a scope of review, and this court has no authority to grant such a review of the facts. *South Dakota v. Volpe*, 353 F.Supp. 335, 338, 342 (D.S.D.1973).

■ The State is, however, entitled to a review of the Secretary's final determination under the provisions of 23 U.S.C. § 131(*l*). The scope of review is not specified by Section 131(*l*). In the absence of any particularized standard of review, the proper standard is the substantial evidence standard found in 5 U.S.C. § 706.

The nature of the substantial evidence standard was considered at length in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Initially, the standard is applicable only where the agency action is taken pursuant to the rulemaking power of the Administrative Procedure Act or when the agency action is based on a public adjudicatory hearing. *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The condition is fulfilled here, since a public adjudicatory hearing was held in this case. In *Universal Camera, supra*, 340 U.S. at 477, 71 S.Ct. at 459, the Supreme Court indicated that substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Substantial evidence was also equated with the amount of evidence necessary to deny a motion for a directed verdict and to justify submitting a case to a jury, where a trial is by jury. The reviewing court must draw its conclusions by reviewing the entire record. The evidence detracting from the Secretary's determination must be considered, as well as that tending to support it. This

does not mean, however, that the court is to weigh the evidence. The only question is whether all the evidence on the record, taken as a whole, fairly supports the Secretary's determination. *Universal Camera, supra*. The sufficiency of the evidence will be reviewed under this standard.

■ The State further contends that the Secretary's determination should be set aside because it is arbitrary and capricious 5 U.S.C. 706(2)(A). Agency action may be arbitrary and capricious even if supported by substantial evidence. *Bowman Transportation, Inc. v. Arkansas Best Freight System*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974).

The arbitrary and capricious standard calls for an "inquiry into the facts [that] is to be searching and careful", but "the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 823. In reviewing administrative action under this standard, the court must determine whether the decision was based on relevant factors and whether there has been a clear error of judgment. The court may not substitute its judgment for that of the agency, and if the record fairly supports the Secretary's exercise of discretion, that discretion is not to be interfered with. *Citizens to Preserve Overton Park, supra*. The agency must give a reasoned basis for its action. The Court will not supply a basis on which the agency did not rely. A decision will, however, be upheld, even when it is of less than ideal clarity, if the agency's path may be reasonably discerned. *Bowman Transportation v. Arkansas Best Freight System, supra*.

II. *WHETHER THE RECORD JUSTIFIES THE SECRETARY'S DETERMINATION.*

A. *Introduction.*

(1) Relevant Provisions of the Highway Beautification Act.

The Secretary of Transportation is given authority to determine compliance with the Act. A ten percent penalty of federal

funds allocated to states for highway construction is levied under the Act against states that do not comply. The purpose of the Act is stated as follows:

The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty. 23 U.S.C. § 131(a).

In order to comply with the Act, and avoid the ten percent penalty, a state is required to prohibit all signs within the control zone, with the exceptions set out below. The control zone was initially defined as being that within 660 feet of interstate and primary highway rights-of-way. This was later expanded to include the area more than 660 feet from the rights-of-way, if signs within this later zone were visible from the highway and erected with the purpose of being read from that highway. The following signs may be permitted, even though they are within the control zone:

(1) Directional and official signs in accordance with rules promulgated by the Secretary;

(2) Signs advertising sale or lease of the property on which they are located;

(3) Signs advertising activities on the property on which they are located;

(4) Signs in existence on October 22, 1968, determined by the State to be of intrinsic historic value, when such determination is approved by the Secretary; and

(5) Signs advertising distribution of free coffee to motorists by non-profit groups. 23 U.S.C. § 131(c).

These categories and the regulations under the Act, 23 C.F.R. 750.153, do not authorize erection and maintenance of certain types of signs which were allowed under South Dakota law relevant to this action. The Act does, however, provide the following exemption:

The Secretary may approve the request of a State to permit retention in specific areas defined by such State of directional signs, displays, and devices lawfully erected under State law in force at the time of their erection which do not conform to the requirements of subsection (c), where such signs, displays and devices are in existence on the date of enactment of this subsection and where the State demonstrates that such signs, displays, and devices (1) provide directional information about goods and services in the interest of the traveling public, and (2) are such that removal would work a substantial economic hardship in such defined area. 23 U.S.C. § 131(o).

Signs are also permitted in areas zoned commercial or industrial, or in unzoned commercial or industrial areas, in accordance with agreements between the Secretary and the State, 23 U.S.C. § 131(d). If the State certifies comprehensive local controls setting size, lighting and spacing standards, these will govern in lieu of an agreement insofar as signs are within commercial and industrial areas zoned or unzoned. *Id.* States are free to impose stricter controls than those called for in the Act. 23 U.S.C. § 131(k).

Signs permitted under any of the above provisions, except Subsection 131(o), are known as conforming signs. These may be maintained so long as they continue to conform to state law. Non-conforming signs (those not fitting within the above provisions) must be removed as federal funds become available to pay compensation for their removal. Signs that are non-conforming, but which come within the provisions of Subsection 131(o) are not subject to removal.

Signs erected in violation of state law at the time of their erection (illegal signs) must also be removed, but no compensation is paid for them. Owners of conforming or non-conforming signs must be compensated if the signs are removed, and the federal government is required to pay seventy-five percent of the cost of removal and compen-

sation to sign owners, 23 U.S.C. §§ 131(g), 131(n). This is apparently also the case if conforming signs are removed because the State law is more strict than § 131.

Further, provisions of the Act and the regulations under it will be set forth as they become relevant.

(2) General Considerations.

■ The State argues that the Federal Highway Administration was required to prove that specific signs located on South Dakota roads at the time of the hearing were out of compliance with the appropriate federal standards. The Federal Highway Administration, on the other hand, contends that highway funds may be withheld if South Dakota law regulating outdoor advertising does not regulate in a way compatible with federal law. The question is essentially one of whether Congress sought to penalize the State for failing to adopt regulations or for having improper signs within its borders. The distinction is important since the Highway Administration presented very little evidence of signs actually out of compliance.

The Highway Administration's position is more reasonable. It is clear from 23 U.S.C. § 131 that Congress intended to regulate future erection of billboards. If the Secretary could not find a state out of compliance until non-conforming signs were erected and if those non-conforming signs were not prohibited by state law, the owners would be entitled to compensation for removal of the signs. 23 U.S.C. § 131(g). If the Secretary were not permitted to determine compliance by considering whether state law conformed to federal law, he could only judge results. He would be forced to inspect the results of state law and not the state law itself. This would entail waiting until after non-conforming signs were erected to determine that the State's control program was insufficient. The language of the Act makes it plain that Congress sought the adoption of conforming laws by the States. If the States do not adopt such laws, they are subject to a ten percent penalty.

B. *Whether SDCL Ch. 31–29 complies with the Act.*

The Secretary found that South Dakota law did not meet federal standards in a number of specific areas:

(1) Directional signs;

(2) Urban area-municipality distinction;

(3) The State's inability to enter into a 23 U.S.C. § 131(d) agreement.

(4) The State's statutorily mandated moratorium on removal of "directional" signs.

This finding will be reviewed in light of the above standards of substantial evidence and arbitrariness.

(1) *Directional Signs*

As noted above, 23 U.S.C. § 131(c) allows erection of directional and official signs and notices. The Secretary's delegate, the Federal Highway Administration, has promulgated regulations pursuant to this subsection defining directional signs. 23 CFR § 750.153–154. The definition of directional signs is located in § 750.153(r)[1] and does not include, as does the State definition in effect at the time relevant to this case[2] the

1. 23 CFR § 750.153(r): Directional signs means signs containing directional information about public places owned or operated by Federal, State or local governments or their agencies; publicly or privately owned natural phenomena, historic, cultural, scientific, educational and religious sites; and areas of natural scenic beauty or naturally suited for outdoor recreation, deemed to be in the interest of the traveling public.

2. SDCL 31–29–62(2): "Directional sign, display or device providing directional information about goods and services in the interest of the traveling public", any sign, display or device

giving directional information pertaining to food services, lodging, gasoline and automotive services, resorts, attractions, campgrounds, truck stops, natural wonders, scenic and historical sites, and areas suited for outdoor recreation or business catering to the traveling public.

SDCL 31–29–63(1): Directional and official signs and notices, as authorized or required by law, which signs may include, but shall not be limited to, signs and notices pertaining to natural wonders, scenic and historic attractions, and directional information concerning goods and services of businesses catering to the traveling public.

advertisement of goods and services of businesses catering to the traveling public.[3]

The State admits this discrepancy, but argues that the Highway Administration had no authority to promulgate the regulations because (1) Congress intended to leave to the states the task of defining what constitutes directional signs and (2) Congress, by amending the language of § 131(c) from "directional and *other* official signs" to "directional and official signs" intended to allow non-official directional signs. The Act specifically gives the Secretary authority to promulgate regulations necessary to implement the section. If Congress had not intended to give the Secretary authority over such matters, it would presumably not have granted such power. To concede that the Secretary has power to enforce controls over size, lighting, spacing and other sign characteristics but not power to control the type of sign is inconsistent with the comprehensive nature of the Act. Further, the elimination of "other" does not dictate a contrary result. There is little, if any, legislative history concerning this amendment. The Congress considered but rejected an amendment that would have used language virtually identical to that contained in South Dakota Law. S.Rep.No. 93–355, 93rd Cong. 1st Sess. 63 (1973); S.Rep.No. 93–1111, 93rd Cong.2d Sess. 13 (1974); H.R. Rep.No. 93–1567, 93rd Cong., 2d Sess. 4 (1974), U.S.Code Cong. & Admin.News 1974, p. 8011; H.R.Rep.No. 94–716, 94th Cong., 1st Sess. 12 (1975), U.S.Code. Cong. & Admin.News 1976, p. 798; S.Rep.No. 94–741, 94th Cong., 2d Sess. 48–49 (1976). Also, the definition in § 750.153(r) does include non-official signs. It is thus not inconsistent with § 131(c), even after Congress eliminated the "other".[4]

South Dakota law on directional signs also fails to comply with federal standards on size, lighting, spacing and number of signs permitted. South Dakota standards are set forth in SDCL 31–29–64 to 67. Section 31–29–64 applies to all outdoor advertising and requires that there be no signs erected within 500 feet of an interchange on certain interstate and limited access highways. The federal standards, 23 CFR 750.154(d)(2) and (3) prohibit signs within 2,000 feet of such interchanges, and include parks, scenic areas and rest areas on unlimited access primary highways.

In addition, the South Dakota size, (SDCL 31–29–65) lighting, (SDCL 31–29–60) and spacing (SDCL 31–29–67) criteria do not conform to the federal criteria in a number of respects. The most serious discrepancy is that they fail to apply to any sign located outside a zoned or unzoned commercial or industrial area. Thus, any sign erected outside commercial or industrial areas is not subject to any size, lighting or spacing requirement. Other respects in which the South Dakota statutes fail to conform are as follows:

a. SDCL 31–29–65 permits signs to a size of 1,200 square feet. The federal standards, 23 CFR 750.154(b)(1)(i) permit a maximum size of 150 square feet;

b. SDCL 31–29–67(2) allows signs to be erected within 500 feet of one another on interstate highways and within 300 feet of one another on primary highways. The federal standards, 23 CFR 750.154(d)(4)(i) require at least a mile between the signs.

c. SDCL 31–29–64 to 67 do not prohibit more than three directional signs in the same direction of travel relating

---

**3.** The House of Representatives proposed addition of the phrase "information in the specific interest of the traveling public, including, but not limited to, signs for rest stops, camping grounds, truck stops, food services, gas, and automotive services, and lodging." This amendment was rejected by the Senate, a committee of which indicated that directional signs should be limited to those disseminating non-commercial information. S.Rep.No. 93–1111,

93rd Cong.2d sess. 13 (1974); H.R.Rep.No.93–1567, 93rd Cong.2d Sess. 4 (1974).

**4.** This amendment was adopted subsequent to the Highway Administration's promulgation of the regulations. The Highway Administration made no change in its regulations, since it did not believe that the amendment required a change. Congress has not amended § 131(c) since 1975. See 40 Fed.Reg. 21934 (1974).

to the same activity, as does 23 CFR 750.154(d)(4)(ii). South Dakota also does not prohibit directional signs more than seventy-five (interstate system) or fifty (primary system) air miles from the activity. 23 CFR 750.-154(d)(4)(iii) and (iv).

d. South Dakota does not limit message content on directional signs to identification and directional information, as do the federal standards 23 CFR 750.154(e).

The State admits these discrepancies, as it must, since they are plain on the face of the statutes and regulations. The State contends, however, that the regulations are inconsistent with 23 U.S.C. § 131 and the legislative intent behind the Act, that the discrepancies are minor in nature, and that the discrepancies can be reconciled by application of 23 U.S.C. § 131(o). The § 131(o) issue is discussed later in this opinion.

■ The Highway Beautification Act explicitly gives the Secretary authority to promulgate regulations relative to directional signs. 23 U.S.C. § 131(c)(1). This authority has been delegated to the Federal Highway Administration, which has duly promulgated the regulations found at 23 CFR 750.153–54. When authority is thus expressly delegated, a reviewing court does not have the power to set aside the regulations simply because the court might have interpreted the statute in a manner different from the agency's interpretation. *Batterton v. Francis*, 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–2406, 53 L.Ed.2d 448 (1977). The regulations under § 131(c)(1) are not merely interpretative, but rather, legislative regulations. They have the force and effect of law and can be set aside only if they clearly exceed the Secretary's statutory authority or are arbitrary, capricious, an

abuse of discretion or otherwise not in accordance with law. 5 U.S.C. §§ 706(2)(A) and (C); *Batterton v. Francis, supra,* at 425–26, 97 S.Ct. at 2405–2406. The record is barren of any evidence that the rules constitute this type of abuse. The court might have adopted different standards, but Congress did not assign the task of adopting such standards to the court. The regulations were adopted under express authority and have been in place since 1973. Congress has not acted to change them. Since their adoption is not clearly outside the statutory mandate, the regulations cannot now be set aside merely because this Court might interpret § 131(c)(1) differently. *Batterton v. Francis, supra.*

■ The State's contention that the discrepancies between state and federal law are minor must also be rejected. The Secretary, who has the initial task of fact finding under the Act, found otherwise. This determination should not lightly be set aside, since the Secretary has considerable experience in interpreting and applying the Act.[5] In addition, the South Dakota statutes, when compared with billboard regulation in the other forty-nine states, permit far larger signs, with much closer spacing than the regulations in any other state. As this court stated in *South Dakota v. Volpe, supra,* certain standards have been established through experience with the Act. There can be little doubt that South Dakota directional sign regulations are outside these standards, and the Secretary therefore did not abuse his discretion in finding that South Dakota had not complied with the Act.

(2) *Urban Area—Municipality Distinction*

23 U.S.C. § 131(b)[6] provides that certain outdoor advertising devices must be con-

**5.** The Secretary has little authority over matters of law but some deference is due to the Secretary's interpretation of the Highway Beautification Act. Although 5 U.S.C. § 706 requires the court to interpret statutory provisions, the court can seek guidance from agencies and other entities having experience in applying and interpreting particular legislation. *Vermont v. Brinegar,* 379 F.Supp. 606, 612–13

(D.Vt.1974). The Secretary has such experience and his interpretation should thus be given some weight even where the Court is required to make its own interpretation of the statute.

**6.** 23 U.S.C. § 131(b):
 Federal-aid highway funds apportioned on or after January 1, 1975, or after the expiration of

trolled, even though they are more than 660 feet off the right-of-way of either the interstate or primary road systems. In order to be subject to control, these devices must be located outside "urban areas". The Federal Highway Administration has interpreted this to mean urban areas as defined by 23 U.S.C. § 101(a). 23 CFR § 750, 703(m). Such urban areas must have populations of 5,000 or more and be within boundaries fixed by collaboration of state and local officials, subject to approval by the Secretary. There are fourteen such areas in South Dakota. SDCL 31–29–63[7] provides that the zone beyond 660 feet is to be controlled only outside the corporate limits of a municipality. An exhibit prepared by the State Highway Department shows that there are 264 incorporated municipalities in South Dakota. A municipality may have as few as 100 residents and 30 qualified electors. SDCL 9–3–1. Although not all of the municipalities are located on the interstate or primary systems, the State's highway map shows that at least twenty non-urban area municipalities are on the interstate, and perhaps one hundred or more are on the primary system.

■ The State insists that no advertiser would erect a sign in a municipality where the sign would have to be more than 660 feet from the right-of-way. Such argument is irrelevant, but in any case, as the Highway Administration points out, the possibility of such signs is not remote. This is particularly so with the interstate system, which often bypasses smaller towns. If the interstate were, for example, five hundred feet from the corporate limits of a municipality, any advertising device could be erected 160 feet or more within the corporate limits without being controlled under South Dakota law. Yet, § 131(b) itself requires control within this zone. It is therefore clear that South Dakota law provides greater opportunity for construction of advertising devices within this area than § 131(b). The Secretary's determination was thus correct on this phase of the case.

(3) *Section 131(d) Agreements.*

A. Generally

23 U.S.C. § 131(d)[8] requires the State and the Secretary to enter into agreement on

---

the next regular session of the legislature, whichever is later, to any State which the Secretary determines has not made provision for effective control of the erection and maintenance along the Interstate System and the primary system of those additional outdoor advertising signs, displays, and devices which are more than six hundred and sixty feet off the nearest edge of the right-of-way, *located outside of urban areas,* visible from the main traveled way of the system and erected with the purpose of their message being read from such main traveled way, shall be reduced by amounts equal to 10 per centum of the amounts which would otherwise be apportioned to such State under Section 104 of this title, until such time as such State shall provide for such effective control. ... [Emphasis supplied]

7. SDCL 31–29–63:

No outdoor advertising shall be erected within six hundred sixty feet of the nearest edge of the right-of-way and visible from the main-traveled way or beyond six hundred sixty feet of the nearest edge of the right-of-way visible from the main-traveled way located outside the *corporate limits of a municipality* and erected with the purpose of its message being read from the main-traveled way of the interstate or primary systems .... [Emphasis supplied].

8. 23 U.S.C. § 131(d):

In order to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with the purposes of this section, signs, displays, and devices *whose size, lighting and spacing, consistent* with customary use is to be determined by agreement between the several States and the Secretary, may be erected and maintained within six hundred and sixty feet of the nearest edge of the right-of-way within areas adjacent to the Interstate and primary sustems which are zoned industrial or commercial under authority of State law, or in unzoned commercial or industrial areas as may be determined by agreement between the several States and the Secretary. The States shall have full authority under their own zoning laws to zone areas for commercial or industrial purposes, and the actions of the States in this regard will be accepted for the purposes of this Act. Whenever a bona fide State, county, or local zoning authority has made a determination of customary use, such determination will be accepted in lieu of controls by agreement in the zoned commercial and industrial areas within the geographical jurisdiction of such authority. Nothing in this subsection shall apply to signs, displays, and devices referred to in clauses (2) and (3) of

what areas will be considered unzoned commercial and industrial areas for purposes of the Act. The Secretary states in his final determination that a state cannot provide for effective control without the agreement. The State of South Dakota had no such agreement with the Secretary or his delegate following *Hogen v. S. D. State Dept. of Transportation,* 245 N.W.2d 493 until December, 1979.

The State contends that the absence of an agreement is due to the refusal of the Secretary or his delegate to negotiate with the State. The State in argument has admitted, however, that the only terms it would or could accept in such an agreement were those contained in SDCL Ch. 31–29.[9] Both the Federal Highway Administration and the Secretary found these terms totally unacceptable, and so informed the Legislature both before and after passage of the 1977 amendments to Ch. 31–29.

The State, in effect, offered to enter into an agreement based on the provisions of Ch. 31–29 (as amended 1977). If these provisions are sufficient to comply with the Act, the Secretary or his delegate was not justified in refusing to enter into an agreement. If, on the other hand, SDCL 31–29 is not sufficient to constitute effective control, the Secretary would not be required to agree to its terms.

The areas for agreement under § 131(d) are the extent of "unzoned commercial and industrial areas" and the size, lighting and spacing criteria within such areas. The Secretary, in his final determination, found South Dakota size, lighting and spacing standards sufficient insofar as they regulated signs in zoned and unzoned commercial and industrial areas.

B. Extent of unzoned commercial and industrial areas.

SDCL 31–29–70 defines unzoned commercial and industrial areas. It permits outdoor advertising on both sides of the highway, and within one mile on either side of any commercial or industrial activity except other outdoor advertising. All land within one thousand feet of any highway, if traversed by any railroad right-of-way, is also included. In addition, if any "pockets" of land not considered zoned or unzoned commercial or industrial of 1,000 feet or less are between areas considered zoned or unzoned commercial or industrial, such "pockets" are also unzoned commercial or industrial for outdoor advertising purposes. Finally, any board of county commissioners is given power to determine what additional areas are appropriate for outdoor advertising, and to declare these areas to be unzoned commercial or industrial without regard to any other zoning classification. The commissioners also have the power under SDCL 31–29–70 to determine that certain parts of the county are not appropriate for outdoor advertising, even though they would otherwise be appropriate under SDCL Ch. 31–29. The total effect of SDCL 31–29–70 would appear similar to that of the strip zoning rejected in *South Dakota v. Volpe, supra.*

The Federal Highway Administration refused to agree to the above provisions because the provisions allegedly made effective control impossible, because the provisions were inconsistent with regulations implementing 23 U.S.C. § 131(d)[10] and because they did not conform to the broad outlines of agreements made with other states. 23 CFR 750.703(1) requires that the areas be unzoned, that they actually be used for commercial or industrial purposes, and that the areas be defined in agreements between the Secretary and the states. SDCL 31–29–70 violates at least the first

---

subsection (c) of this section. [on-premises advertising].

**9.** Presumably the State and the Secretary could now enter into an agreement on terms more acceptable to the Secretary, pursuant to 1979 S.D.Sess.L. Ch. 202 (approved March 13, 1979). That chapter is irrelevant to the present case, however, since it was approved after the Secretary made his final determination.

**10.** 23 C.F.R. 750.703(1):

Unzoned commercial or industrial areas are *unzoned areas* actually *used for commercial or industrial purposes* as *defined in agreements made between the Secretary, . . . and each state* pursuant to 23 U.S.C. § 131(d) [emphasis supplied]

two of these conditions, since it gives local authorities the right to convert zoned areas into "unzoned commercial or industrial" areas and because it authorizes non-commercial or industrial areas to be used for outdoor advertising if they fall into "pockets" of less than 1,000 feet. It also gives local authorities the power to allow outdoor advertising in any area that they feel is appropriate for such advertising, regardless of any zoning or planning for other purposes.

■ The State contends that Congress intended to allow individual states to determine the zoned and unzoned areas for themselves, and that any national standards on the matter are outside the authority of the Secretary. The legislative history cited in support of this proposition, however, referred to *zoned* areas not *unzoned* areas. Further, as this Court said in *South Dakota v. Volpe, supra,* at 341:

> But through experience gained in administering the Act criteria of general applicability nationally [have] been formulated for comparison with those state standards submitted for approval. Charged with administering the Act and preserving the stated purpose from the caprice of the individual states, the Secretary established these generally accepted criteria as a floor to acceptable alternatives. This court concludes that the Secretary so pursuing the Congressional policy of general uniformity across the nation reasonably determined that South Dakota's provisions failed to obtain the level of any standards previously accepted and, therefore, finds South Dakota's provisions unacceptable.

The same applies to this case. Not only are South Dakota's provisions in conflict with 23 CFR 750.703(1), but they are far from the provisions of any of the agreements made with other states, all of which are summarized in the record. No other state allows outdoor advertising more than 1,000 feet from commercial and industrial activities within unzoned areas. The other states control outdoor advertising in non-commercial, non-industrial "pockets". Some states permit advertising only on the same side of the highway as the commercial or industrial activity. Other states do not allow local boards to "unzone" strictly to allow outdoor advertising. The Secretary's determination on this phase of the case is, therefore, supported by the record and in accordance with the law.

(4) *The moratorium on directional sign removal.,*

1977 S.D. Session Laws, Ch. 247, § 3 [11] forbids removal of any outdoor advertising relating to directional information in the interest of the traveling public without prior approval of the legislature. This section clearly conflicts with the Act, the purpose of which is to eliminate non-conforming outdoor advertising, much of which includes the type of advertising that cannot be removed because of this section.

■ The State argues that the moratorium is justified by 23 U.S.C. §§ 131(q)(2) and 131(o). These arguments must be rejected. § 131(q)(2) states that directional signs of this type should be the last signs removed. It does not state that their removal can be prohibited indefinitely as does ch. 247, § 3. The Secretary has implemented 131(q)(2) by putting this type of sign at the bottom of the federal priority list, 23 C.F.R. 750.-304(a), as has the State, SDCL 31–29–81. Neither the Act [§ 131(q)(2)] nor the regulations under it, however, justify a moratorium on sign removal.

---

11. 1977 S.D.Sess.L. Ch. 247, § 3:

No outdoor advertising relating to directional information concerning goods or services provided the traveling public shall be removed or caused to be removed by the state, or by any political subdivision without the owner's consent unless consistent with local ordinance, until further enactment of express legislative authority. No permit, license or other authority shall be required for the erection or maintenance of outdoor advertising which shall, as other land uses, be controlled exclusively by local authority pursuant to SDCL 11.

Because this section was part of a temporary chapter, Ch. 247, requiring a Legislative Research Council study of outdoor advertising, it was never codified in SDCL. Ch. 247 was House Bill 927 of the 1977 South Dakota Legislature.

The State also argues that a moratorium was necessary in order to preserve signs pending an economic hardship exemption under 23 U.S.C. § 131(*o*). The moratorium is, however, much too broad to be excused as aiding a § 131(*o*) application. The moratorium applies to illegal signs and to those erected after May 5, 1976, both of which are not protected under any interpretation of § 131(*o*). Given the fact that both state and federal law place this type of directional sign at the bottom of the removal priority list, it does not appear that the extreme step of a moratorium would be of any aid to the State in a § 131(*o*) exemption application.

### C. *The State's Arguments Regarding Compliance.*

The State makes several arguments on the issue of compliance. It is argued for the following reasons that either the State is in compliance or that it has made a good faith attempt to comply with the Act:

(1) The State's record of billboard removal is near the top of the list of all the states; and

(2) The Act was not intended to apply equally to all states, but was to be flexibly applied to differing situations.

(1) *The State's record of billboard removal.*

 It is clear that the State has, since the Act was passed removed a large number of billboards. According to exhibits offered by both the State and the Highway Administration, over 20,000 signs have been removed and perhaps 7,000 remain. Of these, it was estimated that 5,000 do not comply with the Highway Beautification Act. The State contends that this record of billboard or sign removal in and of itself shows compliance with the Act, or at least a good faith attempt to comply. In light of the State's failure to enact statutes governing outdoor advertising, however, this argument must be rejected.

It is undisputed that the State was in compliance with the Act until the *Hogen* decision was rendered. During this time, many non-conforming and illegal signs were removed, and others were doubtless prevented from being erected by the State's complying regulation of outdoor advertising. Between the date of *Hogen* and March 13, 1979, however, the State was not in compliance with the Act. Pre-*Hogen* sign removal cannot change the fact of non-compliance.

The question is not simply a matter of theoretical distinction between state and federal law. SDCL Ch. 31–29 provided little protection against future erection of billboards, no matter what the record of removal in the past might have been. In short, under Ch. 31–29, it was reasonable for the Secretary to expect that many non-conforming billboards would be erected to replace those that had been removed. It is the legitimate concern of the Secretary that the Highway Beautification Act be complied with in the future as well as in the past. Conforming state regulation, to effectuate the public policy of the Act, must be continuous, not intermittent. For these reasons, the State's argument based on billboard inventory statistics must be overruled.

(2) *Flexibility of the Act*

The State's second argument regarding compliance with the Act is that the differences between federal and state regulations should be disregarded because of the unique position of South Dakota vis-a-vis other states. It is argued that the Act, referring specifically to subsections 131(b), 131(*o*) and 131(g) was intended to be a flexible instrument that would be applied differently to different states. Since South Dakota is a rural state with few urban areas and relatively few industrial and commercial areas, it is argued an "inflexible national standard" should not be applied here. This is said to be particularly the case where the state is heavily dependent upon tourism as a source of jobs and state revenue. It is argued that the Secretary and the Federal Highway Administration have not taken into account the differences between states in applying the Act. The Highway Administration argues that there are differences

in the billboard regulations in the several states. Differences are tolerated, it is argued, but certain standards have emerged through experience and these are typified by Highway Administration regulations, and the agreements between all the other states and the Highway Administration. (*South Dakota v. Volpe, supra*). South Dakota law is, as shown by the discussion above, far out of line with both existing state agreements and Highway Administration regulations.

■ Whatever merit the State's flexibility argument may have, there can be little doubt that Congress intended more regulation of outdoor advertising than was accomplished by the 1977 amendments to SDCL Ch. 31–29. Particularly, with regard to the extent of unzoned commercial and industrial areas, these amendments amount to no effective regulation of outdoor advertising at all. State law, as it stood until March 13, 1979, would not place *any* restriction on the areas in which outdoor advertising could be erected, provided the local board of county commissioners agreed that all areas within the county should be open to such advertising. The State is not in a good position to claim that the Secretary should be "flexible" when it has failed to prohibit outdoor advertising in any areas.

(3) *Scenic Attractiveness.*

■ The Administrative Law Judge in this case also found that much of South Dakota is unattractive and that billboards contributed to safety, since they gave drivers something to look at while driving through boring landscape. He therefore concluded that more billboards should be allowed in places that lack scenic merit. This appears to have been a subjective conclusion, arrived at after the Administrative Law Judge drove from the Black Hills area to Pierre. The Act contains no such exception. Though the Administrative Law Judge did cite some legislative history about billboards obstructing trees, the Act was not intended to protect the view of only those areas that a particular judge might find to be of scenic merit. As the Secretary pointed out, citing floor debate

on the Act, what one person might wish to view in the way of scenery can differ from what another would want to view. Thus, in absence of a Congressional declaration requiring that subjective impressions of scenic beauty be considered, it is preferable to apply the law equally to all areas. It is not the prerogative of any court or judge to determine, other than under standards promulgated by Congress or an agency acting under a valid Congressional delegation, what portions of the landscape should or should not be obstructed by billboards.

D. *Whether the Secretary abused his discretion in failing to suspend the penalty on the fiscal year 1978 funds, pursuant to 23 U.S.C. § 131(b).*

23 U.S.C. § 131(b) provides that the Secretary may suspend the effect of the ten percent penalty on a finding that such a suspension would be "in the public interest". The State argues that the penalty should have been suspended in this case because:

(1) Compliance would have an adverse economic impact on the State;

(2) The State made a "good faith attempt" to comply;

(3) The State's failure to enact complying legislation in 1978 was occasioned by the Secretary's delay, until November, 1978, in rendering his final determination and order;

(4) The Secretary abused his discretion in treating fiscal year 1978 payments (which were withheld and redistributed to the other states) differently from fiscal year 1979 payments (which were to be returned to the State if it complied by March 31, 1979).

(1) *Economic Impact of Compliance*

■ At the administrative hearing, the State presented a great deal of evidence on the cost of compliance. An economics professor from the University of South Dakota testified, and introduced a study indicating that fifty million dollars in income and taxes could be lost if the State complied fully and removed all non-conforming billboards.

Several owners of tourist attractions also testified. In their opinion, the study was conservative and they believed the losses would be greater. The Federal Highway Administration presented an economics professor from another University, who indicated that the study was invalid because it was based upon biased questionnaires and because it grouped regions of the state improperly when assessing the economic impact of billboards. The Administrative Law Judge recommended that the Secretary suspend the ten percent penalty because of this economic impact. The Secretary refused to do so. He held that the public interest exception contained in 23 U.S.C. § 131(b) was, according to legislative history, intended only to aid states that were making an effort to comply but were unable to do so because of unavoidable delay.

The State argues on appeal that this determination was incorrect in light of recent amendments to § 131, particularly subsections 131(o) and 131(q). The State interprets these sections as broadening the Secretary's discretion, and also, the factors he must consider when granting or denying a suspension of the ten percent penalty under 23 U.S.C. § 131(b).

These statutes do not, however, provide for the type of relief the State seeks. Section 131(o) is a carefully circumscribed statute allowing exemptions for certain carefully defined signs in specific areas delineated by a state. It does not excuse statewide non-compliance with the Congressional mandate of § 131(b). The State presumably expected to remain permanently out of compliance over the entire state, since it had not delineated which areas would be hard hit economically by compliance, nor had it indicated that it would come into compliance if the Secretary would "suspend" the penalty. It is significant that the suspension provision of § 131(b), when originally passed, was intended for use as an aid in bringing states into compliance.[12] It is also significant that Congress adopted separate subsections, with carefully circumscribed requirements, when it decided that economic hardship should be considered. Since the State has not complied with the procedures required by these economic hardship sections, any claim for relief under them is without support in the record. The State cannot expand the public interest exception of § 131(b) to include matters clearly not contemplated when that section was enacted, absent some indication that Congress intended the subsection to be so expanded. Enactment of carefully circumscribed subsections 131(o) and 131(g) is not such an indication.

(2) *The State's good faith attempt at compliance.*

The State argues that the Secretary should have suspended the ten percent penalty because of the State's good faith attempt at compliance. As evidence of this attempt, the State offers its record of billboard removal, alluded to above. This record, however, is concerned with what the State has done in the past. The Secretary was, on the other hand, concerned with present regulation and with what billboards would be erected and taken down in the future. The State conceded that there were approximately 5,000 non-conforming billboards remaining.

Whatever the State's record for billboard removal may have been in the past, it is not likely to be satisfactory under a statute *prohibiting* future removal of billboards. 1977 S.D.Sess.L. Ch. 247, § 3. Moreover, the discrepancies between the 1977 South Dakota statutes and the Act are quite plain on the face of the statutes, as the above discussion indicates. The legislature was not, however, restricted to its own evaluation of whether the State was in compliance. The Federal Highway Administration gave the legislature a detailed evaluation of the bills before it, and indicated specific objections. It also stated that one

---

12. S.Rep.No. 709, 89th Cong. 1st Sess. 1, 4, indicates that the penalty suspension provision was primarily for the purpose of allowing legislatures that had to amend their constitutions or go through other lengthy procedural steps in order to adopt complying legislation, to do so without loss of highway funds.

bill would comply with only minor amendments. The Secretary also wrote to the Governor, urging the State to comply. The Highway Administration several times said that it would help to bring the State into compliance. The legislature nonetheless enacted the 1977 legislation, which was patently out of compliance. Such action does not comport with a "good faith attempt" to comply.[13]

(3) *Whether the penalty should be suspended because delay in rendering the Secretary's decision allegedly caused the State not to adopt complying legislation in 1978.*

■ The State argues that if the Secretary's final decision had been rendered prior to January, 1978, the State would have adopted compliance legislation during the 1978 session. This argument ignores the fact that adoption of such legislation would *not* have required the Secretary to suspend the penalty for fiscal 1978 funds, which were apportioned to the State as of late 1977. Considering the entire record in this case, and given the fact that the *1977* legislature (meeting in January-March, 1977) failed to enact complying legislation, it was within the discretion of the Secretary under the Act to redistribute the fiscal 1978 funds. Indeed, absent an affirmative finding that it would be in the "public interest" to suspend the penalty, 23 U.S.C. § 131(b) requires its imposition.

A state seeking to avoid the ten percent annual penalty can determine from the provisions of the Act alone what must be done. The 1978 Legislature was composed of the same legislators who in 1977 adopted noncomplying legislation, notwithstanding the Secretary's efforts to work out a complying statute. Nothing in the record indicates the inaction of the legislature as to compliance legislation in 1978 was anything but an independent expression of the will of a legislative majority.

(4) *Whether the Secretary abused his discretion in treating the fiscal 1978 funds differently from the fiscal 1979 funds.*

■ The order states that the fiscal year 1978 funds are to be withheld and reapportioned to the other states and that the fiscal year 1979 funds are to be *reserved* and withheld *only* if the legislature has not acted by March 31, 1979.

The State is in no position to complain as to the 1979 funds, since the penalty has been rescinded. If reapportionment of the 1978 funds was authorized by the Act, as discussed, supra, it is difficult to see why the 1979 provision is at all relevant here. The Secretary indicated that a conditional order would provide a strong incentive for the State to comply. As noted above, a public interest suspension under § 131(b) requires an affirmative finding that the suspension would be in the public interest. The Secretary explicitly made such a finding concerning the fiscal 1979 funds. It is reasoned in his final determination that a conditional reservation of these funds would induce compliance, and that inducing compliance is the purpose Congress had in mind when it gave the Secretary the power to suspend the penalty in the public interest. In light of the conclusion that only the possibility of inducing compliance would justify a § 131(b) suspension of the penalty, the Secretary's order is susceptible of only one interpretation—that he found as a matter of fact, and pursuant to his discretion, that South Dakota would be more likely to pass complying legislation if the fiscal 1978 funds were withheld and reapportioned rather than merely suspended or reserved. Thus, the Secretary's reason for exercise of the discretion granted by the Act may reasonably be discerned, *Bowman Transportation v. Arkansas Best Freight System, supra.*

---

**13.** The Federal Highway Administration also introduced documents showing its efforts to bring the State into compliance during the 1978 legislative session. These were not admitted by the Administrative Law Judge, because they allegedly constituted evidence of settlement offers. Although he found this rationale questionable, the Secretary did not overturn the failure to admit the documents. These documents have not, therefore, been considered by this court on the question after State's alleged good faith attempt at compliance.

CONCLUSION

It is plain from the above discussion that the record contains ample evidence to sustain the Secretary's determination. Considering all the evidence on the record, even including that which might be opposed to the Secretary's decision, it is held that the record fairly supports the Secretary's determination. In addition, it is held that the decision was based upon relevant factors and did not involve a clear error of judgment. The determination must, therefore, be affirmed. *Bowman Transportation v. Arkansas Best Freight System, supra,* 419 U.S. at 284–8, 95 S.Ct. at 441–443.

The State's Motion for Summary Judgment is denied. Defendants' Motion for Summary Judgment is granted, and an order to this effect will be entered accordingly.