George W. PIGG, Plaintiff–Appellee,

v.

STATE DEPARTMENT OF HIGHWAYS, State of Colorado; State Highway Commission of Colorado and Joseph A. Fortino, King H. Harris, Grant Wilkins, Charles Hanavan, George D. Alderman, C.W. Brennan, James Golden, Bill E. Roundtree and Richard J. Albrecht, in their official capacities as State Highway Commissioners, and Robert L. Clevenger, in his official capacity as Chief Engineer, State Division of Highways, Defendants–Appellants.

No. 86SA4.

Supreme Court of Colorado.

Nov. 30, 1987.

Rehearing Denied Dec. 21, 1987.

Morris, Lower & Sattler, Bruce W. Sattler, Denver, for plaintiff-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mark E. May, Asst. Atty. Gen., Natural Resources Section, Robert A. Hykan, Asst. Atty. Gen., Lynn B. Obernyer, First Asst. Atty. Gen., Denver, for defendants-appellants.

ROVIRA, Justice.

The Colorado Outdoor Advertising Act (Act), § 43–1–401 to –420, 17 C.R.S. (1984), and regulations promulgated thereunder by the appellant Colorado State Department of Highways (Department), 2 C.C.R. 601–3 (1983), restrict the content, size, lighting, and spacing of signs that may be erected and maintained along highways in Colorado. The issue in this case is whether the Act applies to noncommercial advertising devices, and if so whether it is constitutional.

I.

Appellee George W. Pigg operates a ranching business near Pueblo, Colorado. Interstate Highway 25 divides Pigg's property into four parts: one large parcel abuts the east side of the highway, and three smaller parcels abut the west. Pigg purchased the property in 1956, and from then until 1974 he maintained a number of commercial advertising signs along both sides of the highway.

In 1974, the Department condemned 21 of Pigg's signs pursuant to the Act, § 43–1–414(1), 17 C.R.S. (1984), and later paid him $17,900 for the taking; that figure was determined to be just compensation in an eminent domain proceeding. *See* § 43–1–414(2), 17 C.R.S. (1984). Pigg appealed the award as inadequate. In a separate proceeding, the Department obtained permission to remove five more signs Pigg erected after the eminent domain proceeding. Pigg appealed that decision, also, but was unsuccessful on both appeals. *See State Department of Highways v. Pigg*, 656 P.2d 46 (Colo.App.1982) (affirming $17,-900 compensation award); *State Department of Highways v. Pigg*, 653 P.2d 67 (Colo.App.1982) (affirming summary judgment in favor of Department on its complaint to remove signs).

Before those two cases were resolved on appeal, Pigg erected over 50 signs bearing noncommercial messages, most of which were related to his dissatisfaction with the condemnation award and his dealings with

the Department.[1]  In response, the Department sent Pigg a Notice of Violation (Notice) of the Act on July 27, 1982, directing him to remove all but three of the signs. Of the 54 "advertising devices" enumerated in the Notice as standing in violation of the Act and regulations, 35 bore noncommercial messages, one bore an arguably commercial message, and 18 were in some state of disrepair or were bare structures holding no signs at all.

Pigg challenged the Notice pursuant to the State Administrative Procedure Act. After a hearing at which Pigg was represented by counsel, the hearing officer concluded that the Notice was correct and ordered Pigg to remove the advertising devices.

Pigg then appealed to the Colorado Highway Commission (Commission), which affirmed and adopted the hearing officer's decision in its final decision and order. Pigg then filed a complaint in the district court seeking judicial review of a final agency decision.  He claimed that the Act regulates only commercial speech, and that the Department's regulations are void because the Act does not authorize the regulation of structures bearing noncommercial messages.  Further, he argued, if the Act and regulations were interpreted to apply to his noncommercial signs, they would be in violation of the first and fourteenth amendments to the United States Constitution and article II, section 10 of the Colorado Constitution.

The district court ruled that the Act was intended to govern only commercial advertising devices, and therefore the Department had no statutory authority to place restrictions on noncommercial advertising devices such as Pigg's.  The court reversed the Commission's final decision and order. The Department, the Commission, and the chief engineer of the Department appeal that decision.  We reverse the judgment of the district court.

## II.

### A.

Colorado began regulating roadside advertising in the early part of this century, but for the most part the restrictions on advertising were minimal.  *See* 1963 C.R.S. 120–5–1 to –13 The Act, which effectively bans outdoor advertising in rural and residential areas, was enacted in 1966 primarily to enable the state to receive its full share of federal aid highway funds in light of the Federal Highway Beautification Act of 1965, 23 U.S.C.A. § 131 (1966 & Supp. 1987) (Beautification Act).

The Beautification Act was enacted to combat the overuse of billboards and other outdoor advertising devices along the nation's highways "in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty."  *Id.* § 131(a).  The Beautification Act does not itself regulate outdoor advertising.  Instead, it penalizes a state that fails to provide "effective control" of outdoor advertising by mandating forfeiture of 10 percent of its federal aid highway funds until such time as the state provides for effective control.  *Id.* § 131(b).  The statute specifies that:

---

1. Some signs are intended primarily to decry the inadequacy of the compensation Pigg was awarded for the condemnation of his signs:

    Help!  if the Right to 21 Advertising Signs
      WAS AGAIN RETURNED TO ME
    OR JUST COMPENSATION For the taking
      NOT STARVING WOULD I BE
And:
    This Sign Produced Landowner / Compensation Paid Landowner
      $50.00 Net Per Mo. _____ / For Its Taking
    $4.00 Per Mo.
      ANYONE WHO CLAIMS
      $50.00 TAKEN FROM ME
      WILL EQUALLY BE REPLACED
      WITH $4.00

Can Only Be Classed As An Idiot Others comment more generally on Pigg's perception of the government after his dealings with the Department:

    The small thief is sent to CANON
    sentenced to LUXURY for his Act
      The big thief goes to Denver
      and becomes a Bureaucrat
And:
      Take all the Bulls in Texas
      Pile the manure in a stack
      The volume would be minor
      Compared to bureaucrats

Effective control means that such signs, displays, or devices ... shall, pursuant to this section, be limited to (1) directional and official signs and notices, ... (2) signs, displays, and devices advertising the sale or lease of property upon which they are located, (3) signs, displays, and devices ... advertising activities conducted on the property on which they are located....

23 U.S.C.A. § 131(c) (1987 Supp.).

The Secretary of Transportation has promulgated regulations pursuant to the Beautification Act further defining "effective control" in terms of restrictions on the content, size, lighting, and spacing of signs permitted under section 131. 23 C.F.R. § 750.101 *et seq.* (1987). Those regulations include certain limitations with respect to the on-premise signs referred to in section 131(c)(2) and (3), but at the same time require states to determine the circumstances in which certain signs are exempt from section 131(c):

**On-property or on-premise advertising**

(d) Signs are exempt from control under 23 U.S.C. 131 if they solely ... advertise activities conducted on the property on which they are located.... State laws or regulations shall contain criteria for determining exemptions. These criteria may include:

. . . .

(2) A purpose test for determining whether a sign has as its sole purpose the identification of the activity located on the property....

(3) The criteria must be sufficiently specific to curb attempts to improperly qualify outdoor advertising as "on-property" signs, such as signs on narrow strips of land contiguous to the advertised activity when the purpose is clearly to circumvent 23 U.S.C. 131.

23 C.F.R. § 750.709 (1987).

The Act, as it was originally enacted, followed the formal requirements and utilized the language of the Beautification Act. As the Act was amended over the years, the legislature ensured the statute's conformity with the Beautification Act by adopting those definitions and restrictions set out in federal regulations. The practice of the legislature in conforming the Act to the federal law with few substantial changes suggests both that the legislature's primary concern has remained the preservation of the state's share of federal highway funds, and that the legislature intended to prohibit only those signs that would conflict with federal law.[2]

We turn now to the specific statutory provisions at issue in this case. The Act defines "advertising device" to mean:

[A]ny outdoor sign, display, device, figure, painting, drawing, message, placard, poster, billboard, or any other contrivance designed, intended, or used to advertise or to give information in the nature of advertising and having the capacity of being visible from the travel way of any state highway....

§ 43–1–403(1), 17 C.R.S. (1984). *See* 23 C.F.R. 750.703(i) (1987) (utilizing substantially identical definition, but with phrase "used to advertise or inform").

The Act specifies the types of advertising devices that may be erected and maintained "when in compliance with all provisions of this [Act] and the rules and regulations adopted by the department [of highways]." § 43–1–404(1), 17 C.R.S. (1984). Included among the permitted advertising devices are on-premise advertising devices. § 43–1–404(1)(b).

The Department contends that Pigg's signs fall within the category of "on-premise" advertising devices and that the regulations governing the number of such signs are valid. Further, the Department argues that the order requiring Pigg to limit the size and number of billboard's on his property did not infringe his constitutional right to free speech.

Pigg asserts three bases for upholding the district court's judgment. He argues

---

**2.** Additional history of the Act may be found in *Nat'l Advertising Co. v. Dept. of Highways,* 718 P.2d 1038 (Colo.1986).

first—and the district court found—that the Act was intended to govern only commercial advertising devices and not political or ideological signs. Therefore, the Department's regulations which purport to control Piggs' signs are void as falling outside the Department's statutory authority.

Second, he contends that if the Act bans all advertising devices except those enumerated, it is unconstitutional since ideological signs are not "on-premise" advertising devices and are not otherwise permitted. As a consequence, the Act impermissibly discriminates in favor of commercial signs.

Finally, he argues, even if the Department's regulations allow the construction of noncommercial on-premise signs, the statute unconstitutionally favors commercial speech by exempting certain tourist-related signs.

We disagree with all three arguments.

### B.

█ The Act was modeled on the Beautification Act and designed to permit the erection and maintenance of any sign consistent with the restrictions imposed by the federal law. We thus look first to the federal law to assist us in determining whether the Act was intended to govern only commercial advertising devices. We then consider the language of the statute and its legislative history to determine whether it should apply only to commercial signs.

Unfortunately, the history of the Beautification Act contains no clear evidence of how Congress itself viewed the law as affecting noncommercial and ideological signs. The witnesses called before House and Senate subcommittees testified either to support the economic necessity of commercial advertising devices, or else to support the proposed limitations on signs for aesthetic reasons. Neither the subcommittees nor the witnesses appear to have addressed the law's effect on ideological signs located on a sign owner's land. *See generally, Hearings on S. 2084 Before the Subcommittee on Roads of the Senate Committee on Public Works,* 89th Cong., 1st Sess. (1965); *Hearings on H.R. 8487 Before the Subcommittee on Roads of the House Committee on Public Works,* 89th Cong., 1st Sess. (1965). In addition, neither the House Report on the Beautification Act as it was finally passed nor the Senate Report on its own similar legislation sheds much light on the Act's intended scope with respect to noncommercial signs. *See* H.R. Rep. No. 1084, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin. News 3710; S.Rep. No. 709, 89th Cong., 1st Sess. (1965). Finally, we are reluctant to accord much weight to what little legislative history there is, especially since passage of the Beautification Act was accomplished quickly and with little consideration either in committee or on either floor. *See* Minority Views on S. 2084, H.R.Rep. No. 1084, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 3710, 3724.

The legislative history of the Act is similarly unenlightening. It is axiomatic that "legislative intent is the polestar of statutory construction." *People v. District Court,* 711 P.2d 666, 670 (Colo.1985); *Schubert v. People,* 698 P.2d 788, 793 (Colo. 1985). We may look both to the language of the statute and to the purposes underlying enactment of the law to help us ascertain that intent. *Schubert,* 698 P.2d at 793–94; *Colorado Department of Social Services v. Board of County Commissioners,* 697 P.2d 1 (Colo.1985). In both the purposes of the Act and in its various definitional provisions we find strong reasons to believe that the Act was intended to cover noncommercial, as well as commercial, advertising.

The definition of "directional" advertising devices indicates that the legislature was concerned with noncommercial, as well as commercial, advertising devices:

(4) "Directional advertising device" includes, but is not limited to: Advertising devices containing directional information about public places owned or operated by federal, state, or local governments or their agencies; publicly or privately owned natural phenomena, historic, cul-

tural, scientific, educational, and religious sites; and areas of natural scenic beauty or naturally suited for outdoor recreation, deemed to be in the interest of the traveling public....

§ 43–1–403, 17 C.R.S. (1984). The legislature's specific enumeration of permissible directional signs, many of which clearly are noncommercial, belies the claim that the legislature was concerned only with commercial signs. If Pigg were correct that noncommercial signs are not subject to the regulations promulgated under the Act, then there would be little purpose in the statute's inclusion of devices advertising governmentally controlled places or devices identifying natural wonders as permitted directional advertising devices.

The definition of "official advertising device" is similarly telling:

(13) "Official advertising device" means any advertising device erected for a public purpose authorized by law, but the term shall not include devices advertising any private business.

43–1–403, 17 C.R.S. (1984). Had the legislature intended to control only commercial signs, it would have been unnecessary to specify that official signs may be maintained. The express exclusion of signs "advertising any private business" from the class of "official advertising devices" further demonstrates that the Act was intended to provide for the regulation of more than just commercial signs.

Moreover, noncommercial signs pose as much a threat to the goals underlying the Act as do commercial signs. The Act was designed:

[T]o further the following substantial state interests:

(I) Protection of the public investment in the state highway system;

(II) Promotion of safety upon the state highway system;

(III) Promotion of the recreational value of public travel;

(IV) Promotion of public pride and spirit both on a statewide and local basis;

(V) Preservation and enhancement of the natural scenic beauty of this state;

(VI) Broadening the economic well-being and general welfare by attracting to this state tourists and other travelers....

§ 43–1–402(1)(a), 17 C.R.S. (1984).

It is self-evident that an advertising device detracts from the natural scenic beauty visible from the highway whether it bears a commercial message or a noncommercial message. Also, to the extent the state is concerned about the safety of travelers when drivers are distracted by reading signs, that concern does not depend on the nature of the message being communicated.

We believe that neither the history of the Act nor its language suggests that the legislature intended that the Act apply only to commercial signs. We hold that the Act's proscriptions cover advertising devices bearing noncommercial messages.

### C.

■ Among the advertising devices permitted by the Act are "on-premise advertising devices," which the Act defines as encompassing any

(14) [A]dvertising device advertising the sale or lease of the property on which it is located or advertising activities conducted on the property on which it is located.

§ 43–1–403, 17 C.R.S. (1984).

The Department is responsible for adopting and enforcing rules and regulations governing on-premises advertising devices. § 43–1–415(1)(c), 17 C.R.S. (1984). The Department's regulations divide on-premise signs into several categories based on their content, and tailor restrictions to the category in which the sign belongs. *See* Rule V.1, 2 C.C.R. 601–3 (1983).

The Department asserts that Pigg's signs are subject to the following regulation:

For the purposes of noncommercial advertising devices (ex. religious, social or political commentaries) erected by the owner or lessee of property, the premises is the primary structures, parking area and private roadway. Noncommercial signs that are on the premises or within

approximately 50 feet thereof are on-premise signs. To further the purposes of the act, noncommercial signs that are more than approximately fifty feet from the premises may be no larger than 150 square feet and are limited to two signs visible to traffic proceeding in any one direction if the highway frontage of the property upon which the premises is located is less than one mile in length. If the highway frontage of the property upon which the premises is located is more than one mile in length, one sign visible to traffic proceeding in any one direction per mile is allowable.

Rule V.1.f, 2 C.C.R. 601–3 (1983). The size and placement restrictions are identical to those imposed on commercial on-premise signs. Rule V.1.d, 2 C.C.R. 601–3 (1983).

Pigg contends that his signs are not "on-premise" advertising devices within the meaning of the Act. As a consequence, he argues, the Act imposes an unconstitutional ban on ideological speech.[3]

· The crux of Pigg's argument is that under the Act, a sign must advertise the sale or lease of the property on which the sign is located, or advertise activities conducted thereon, to constitute an on-premise sign. By construing ideological signs as on-premise signs, he claims, the regulations go beyond the scope of authority granted by the Act.

Administrative regulations are presumed valid and will be set aside only when the party who challenges them establishes their invalidity beyond a reasonable doubt. *Augustin v. Barnes*, 626 P.2d 625, 627 (Colo.1981). In addition, we will accord deference to the interpretation of a statute by the executive agency charged with enforcing it. *Ingram v. Cooper*, 698 P.2d 1314, 1316 (Colo.1985); *City & County of Denver v. Industrial Commission*, 690 P.2d 199, 203 (Colo.1984). We will not, however, enforce a regulation which modifies or contravenes a statute or regulates beyond the scope of authority granted by the legislature. *Miller International, Inc. v. Department of Revenue*, 646 P.2d 341, 344 (Colo.1982); *Travelers Indemnity Co. v. Barnes*, 191 Colo. 278, 282, 552 P.2d 300, 303 (1976).

In *South Dakota v. Adams*, 506 F.Supp. 60 (D.S.D.), *aff'd*, 635 F.2d 698 (8th Cir. 1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981), the court addressed a similar challenge to the federal regulations. South Dakota forfeited a portion of its federal aid highway funds after the Secretary of Transportation determined that South Dakota's content restrictions on directional signs were inadequate to satisfy the "effective control" requirement of section 131 of the Beautification Act. South Dakota argued that the content restrictions embodied in the federal regulations went beyond those authorized by Congress. The court disagreed:

> The Highway Beautification Act explicitly gives the Secretary authority to promulgate regulations relative to directional signs. This authority has been delegated to the Federal Highway Administration.... When authority is thus expressly delegated, a reviewing court does not have the power to set aside the regulations simply because the court

**3.** Pigg does not suggest a definition of "ideological" in his brief. For the purposes of his argument, we will assume that Pigg's signs display the type of speech that is afforded protection by the first amendment. *See City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 57 n. 5 (Colo.1981).

Because we find that the Act does permit the maintenance of advertising devices that exhibit noncommercial or ideological messages, we do not address whether a complete ban on such speech would be unconstitutional. Pigg asserts that it would be, but provides no authority or argument in support of his contention. The courts that have addressed the issue are not in agreement. *Compare Wheeler v. Comm'r of*

*Highways*, 822 F.2d 586 (6th Cir.1987) *and State v. Lotze*, 92 Wash.2d 52, 593 P.2d 811, *appeal dismissed*, 444 U.S. 921, 100 S.Ct. 257, 62 L.Ed. 2d 177 (1979) (bans on political billboards held constitutional) *with Metromedia, Inc. v. San Diego*, 453 U.S. 490, 514 n. 18, 101 S.Ct. 2882, 2895 n. 18, 69 L.Ed.2d 800 (1981) (plurality opinion) (disagreeing with *Lotze*) *and Van v. Travel Information Council*, 52 Or.App. 399, 628 P.2d 1217 (1981) (ban on political billboards held unconstitutional) *and State v. Pile*, 603 P.2d 337 (Okla.1979), *cert. denied*, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981) (suggesting that ban on noncommercial signs would raise serious constitutional problems).

might have interpreted the statute in a manner different from the agency's interpretation. The regulations under § 131(c)(1) are not merely interpretative, but rather, legislative regulations. They have the force and effect of law and can be set aside only if they clearly exceed the statutory authority or are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The record is barren of any evidence that the rules constitute this type of abuse. The court might have adopted different standards, but Congress did not assign the task of adopting such standards to the court. The regulations were adopted under express authority and have been in place since 1973. Congress has not acted to change them. Since their adoption is not clearly outside the statutory mandate, the regulations cannot now be set aside merely because this court might interpret § 131(c)(1) differently.

506 F.Supp. at 67 (citations omitted).

Although *Adams* dealt with the federal regulation of directional advertising devices, we find its reasoning persuasive and consistent with the applicable principles of Colorado law.

We noted above that the scant legislative history available suggests only that the legislature intended to permit the maintenance of any sign not inconsistent with the Beautification Act. The regulations promulgated under the Beautification Act in turn require states to establish criteria, either through statutes or through administrative regulations, for assessing whether particular classes of signs satisfy the "on-premise" exception. The Colorado legislature left the specification of those criteria to the Department, and made no statutory change to alter the Department's interpretation of the "on-premise" exception after those regulations were promulgated.

The effect of the regulation is to permit the owner of property to place on his land any sign, not leased or rented to a third party, which conforms to the applicable size, spacing, lighting, and content requirements. The regulations do not discriminate against noncommercial or ideological signs, inasmuch as they are governed by the same restrictions which apply to other on-premise signs. We also note in passing that by so interpreting the statute, the department's regulations avoid the potential constitutional problems that would arise were the statute to be interpreted as entirely prohibiting ideological signs on the owner's property.

D.

■ Finally, Pigg argues that the Act and regulations, as promulgated and interpreted by the Department, discriminate unconstitutionally in favor of certain tourist-related signs. We are not persuaded by his argument.

Section 43-1-414(5)(a), 17 C.R.S. (1984), exempts from removal under the Act "[t]ourist-related advertising devices which comply with the rules and regulations adopted by the department ...," when such removal would work "substantial economic hardship" in the affected area. The exemption was adopted after Congress specifically permitted states to provide such exemptions consistent with the Beautification Act. 23 U.S.C.A. § 131(*o*) (Supp.1987). Pigg is correct in asserting that the tourist-related sign exemption operates to permit the maintenance of certain commercial signs only and not the maintenance of any noncommercial signs. That it does so does not, however, render the statutory scheme unconstitutional.

In *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), Justice Brennan concurred in the judgment and, although finding San Diego's sign regulations impermissible, added:

[A] city can have specific goals the accomplishment of which would conflict with the overall goals addressed by the total billboard ban. It would make little sense to say that a city has an all-or-nothing proposition—either ban all billboards or none at all.... [I]f a city can justify a total ban, I would allow an exception only if it directly furthers an interest that is at least as important as the interest underlying the total ban, if the exception is no broader than neces-

sary to advance the special goal, and if the exception is narrowly drawn so as to impinge as little as possible on the overall goal. To the extent that exceptions rely on content-based distinctions, they must be scrutinized with special care. 453 U.S. at 532 n. 10, 101 S.Ct. at 2905 n. 10. We adopted Justice Brennan's analysis in *City of Lakewood v. Colfax Unlimited Association,* 634 P.2d 52, 69 (Colo.1981), when we considered under what circumstances *de minimis* content-based distinctions could be drawn by a municipal sign ordinance.

Here, the tourist-related sign exception is directly related to the state's goal of avoiding "substantial economic hardship," which the statute defines as:

> [A] significant negative economic effect, such as a loss of business income, an increase in unemployment, a reduction in sales taxes or other revenue to the state or other government entity, a reduction in real estate taxes to the county, and other significant negative economic factors.

§ 43–1–403(18), 17 C.R.S. (1984).

The state's interest in not undercutting the economic base of those areas heavily dependent on tourist-related income is, we believe, as important as its desire to protect the safety of highway travel and to enhance the scenic view from highways. The Act defines the exception narrowly so as to permit only those signs in existence on May 5, 1976, *see* § 43–1–403(16), 17 C.R.S. (1984), and imposes on the sign owners the burden of demonstrating the economic necessity of their signs, § 43–1–414(5)(a), 17 C.R.S. (1984), as do the regulations promulgated to implement the exemption. *See* Rule XVIII, 2 C.C.R. 601–3 (1983). Finally, claims of hardship to a single business are insufficient to justify an exemption for that business's signs. Several businesses must demonstrate that they will be adversely affected and that "the defined area as a whole will be significantly economically impacted ... if those businesses' non-conforming signs are removed." Rule XVIII. B.2.b, 2 C.C.R. 601–3 (1983). *See also* 23 C.F.R. § 750.503(a) (1987) ("Neither the States not the FHWA shall rely on individual claims of economic hardship.").

Because the tourist-related sign exemption is tailored narrowly to further an important interest of the state, that exception does not unconstitutionally discriminate in favor of tourist-related advertising devices.

We conclude, therefore, that the Act applies to noncommercial advertising devices and that the Notice of Violation was issued pursuant to valid regulations of the Department. The judgment is reversed, and the case remanded to the district court with directions to dismiss the complaint.