**ORSINGER OUTDOOR ADVERTISING, INC., Plaintiff–Appellant,**

v.

**The DEPARTMENT OF HIGHWAYS OF the STATE OF COLORADO, Robert Clevenger, the Department of Administration of the State of Colorado, and Thomas R. Moeller, Defendants–Appellees.**

**No. 86SA215.**

Supreme Court of Colorado, En Banc.

Feb. 22, 1988.

Holme Roberts & Owen, Pamela J. Strauss, Lawrence L. Levin, Clifford P. Jones, Englewood, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mark E. May, and Lynn B. Obernyer, Asst. Attys. Gen., Denver, for defendants-appellees.

QUINN, Chief Justice.

Orsinger Outdoor Advertising, Inc. (Orsinger) appeals from a district court judgment upholding the decision of the Department of Highways (department) denying Orsinger's applications for sign permits because the signs did not comply with the spacing requirements of the Roadside Advertising Regulations (regulations), 2 Colo. Code Regs. § 601-3 (1983), promulgated by the department pursuant to the Outdoor Advertising Act, §§ 43-1-401 to -420, 17 C.R.S. (1984 and 1987 Supp.).[1] The issues on this appeal range over a broad area. Orsinger challenges the Outdoor Advertising Act and the regulations as violative of due process of law, and also contends that the department enforced the regulations against it in a discriminatory manner in violation of equal protection of the laws. Orsinger further asserts that the Outdoor Advertising Act unlawfully delegates legislative authority to the department by not providing adequate standards for the exercise of the department's rulemaking authority, and that, even if the Outdoor Advertising Act grants some rulemaking authority to the department, the regulations dealing with the spacing requirements between signs exceed the scope of the department's authority. Orsinger additionally argues that the department, in denying Orsinger's applications for sign permits, incorrectly interpreted and applied the spacing regulations; that the hearing officer improperly allocated the burden of proof at the administrative phase of the permit hearing; that the department was estopped from applying its regulations to one of the two signs for which Orsinger sought permits; and that the department's denial of Orsinger's applications was arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence. Finding no error, we affirm the judgment of the district court.

## I. *The Basic Facts*

The Outdoor Advertising Act provides that any outdoor advertising sign located along primary and secondary highways in areas zoned under authority of state law for industrial or commercial purposes may be erected and maintained only when in compliance with the rules and regulations of the department. § 43-1-404(1)(e), 17 C.R.S. (1984). The regulations adopted by the department require a permit for any such sign adjacent to the state highway system. 2 Colo.Code Regs. § 601-3(VII) (1983). "Areas adjacent to the state highway system" include those areas "which are visible from the main-traveled way and within 660 feet of the nearest edge of the right-of-way." *Id.* § 601-3(IV)(E).

Orsinger erected two outdoor advertising signs in January 1982 and electrified the signs in February of that year. Both signs were located in areas zoned for industrial or commercial uses under authority of state law. One sign was located at 725 S. Monaco Parkway in Denver (the Monaco sign) and the other at 9899 E. Iliff Avenue in Arapahoe County (the Iliff sign). Orsinger had previously obtained building permits from the City and County of Denver for the Monaco sign and from Arapahoe County for the Iliff sign. The Monaco sign was visible from and within 660 feet of Leetsdale Drive, which is State Highway 83, and the Iliff sign was likewise visible from and within 660 feet of Parker Road, which is also State Highway 83.

Ronald E. Scott, the department's sign inspector, first noticed the Monaco sign structure on February 8, 1982. Scott made measurements of the distances between the Monaco sign and the other signs in the area in accordance with regulation 601-3(X)(N), which states that "[d]istances be-

---

**1.** Orsinger originally filed this appeal in the court of appeals, but this court subsequently accepted jurisdiction on the basis of Orsinger's constitutional challenges to the Outdoor Advertising Act. *See* § 13-4-110(1)(a), 6A C.R.S. (1987).

tween sign structures located on the same side of the highway shall be measured along the nearest edge of the pavement between points directly opposite the closest points of the signs to the highway." The department's interpretation of this regulation is that distances between sign structures on the same side of the highway shall be determined by projecting a line commencing at and perpendicular to the edge of the highway pavement and extending to that part of the sign closest to the highway, then by projecting a similar line to another sign in the area, and by measuring the distance between the lines at the edge of the highway pavement. Scott followed this procedure and determined that the Monaco sign was only twenty feet from a nearby sign and thus was in violation of regulation 601-3(VII)(B)(3)(b)(2), which prohibits any two signs from being spaced less than 100 feet apart within an incorporated village or city.

Scott met with Elwood E. Curtis, Orsinger's regional lease manager, and explained to him that any advertising on the Monaco sign would be in violation of the spacing requirement, unless the advertising was "on-premise advertising."[2] In May 1982, Scott noticed that advertising visible from State Highway 83 had been mounted on the Monaco sign and that the advertising was not "on-premise advertising." Scott informed Curtis that Orsinger must apply to the department for a sign permit. In early June 1982, Orsinger made application for a sign permit, but the application was denied due to the spacing violation.

Scott first became aware of the Iliff sign on April 8, 1982, and again contacted Curtis and met with him at the sign site on that day. Scott measured the distance between the Iliff sign and another adjacent sign at approximately 100 feet.[3] Believing that the sign was within the municipal boundaries of Denver, Scott mistakenly told Curtis that the sign satisfied the spacing requirement and told Curtis that he should seek a permit. In fact, however, the Iliff sign was located in an unincorporated area of Arapahoe County and thus was in violation of regulation 601-3(VII)(B)(3)(b)(1), which prohibits any two signs from being spaced less than 300 feet apart outside of an incorporated village or city. Although Curtis knew at this time that the Iliff sign was in an unincorporated area of Arapahoe County, he did not inform Scott of that fact. Scott later learned of the true location of the Iliff sign and told Curtis that he had made a mistake in stating that the sign conformed to the spacing requirement.[4] In late May 1982 Orsinger applied to the department for a permit for the Iliff sign, but again the application was denied due to the violation of the spacing regulation.

In October 1982, Orsinger, pursuant to section 43-1-412(3), 17 C.R.S. (1984), requested the department to conduct a hearing on the denial of sign permits for the Monaco and Iliff signs. The hearing was conducted by a hearing officer on February 23 and March 17-18, 1983. Orsinger raised several constitutional challenges to the Outdoor Advertising Act and the regulations promulgated thereunder by the department, but the hearing officer refused to rule on those claims as beyond his authority. See, e.g., Kinterknecht v. Industrial Commission, 175 Colo. 60, 485 P.2d 721 (1971). At the outset of the hearing, the hearing officer ruled that the burden of proof was on the department to establish that Orsinger's signs did not comply with departmental regulations. Subsequent to

2. The regulations provide an exception from the spacing requirements for "on-premise" signs. 2 Colo.Code Regs. § 601-3(VII)(B)(3)(d) (1983). An "on-premise advertising device" is defined in the act as "an advertising device advertising the sale or lease of the property on which it is located or advertising activities conducted on the property on which it is located." § 43-1-403(14), 17 C.R.S. (1984).

3. Subsequent measurements by the department, utilizing the formula specified in regulation 601-3(X)(N) disclosed the distance between the Iliff sign and the next nearest sign to be only 70 feet.

4. Scott testified that he had several conversations with Curtis about the Iliff sign. He had stated that he contacted Curtis in April 1982 about his erroneous statements on April 8, 1982, regarding the Iliff sign, but later acknowledged that in a prior deposition he stated that this contact occurred in August 1982.

the evidentiary phase of the hearing, however, the hearing officer in a written decision on April 14, 1983, acknowledged that his initial determination concerning the burden of proof was incorrect and expressly determined that, notwithstanding that error, the department carried the burden and established that it properly had denied Orsinger's permit applications. The hearing officer also concluded that the department had authority to regulate signs not legible from nor oriented toward a state highway, that the department correctly interpreted and applied regulation 601–3(X)(N) in measuring distances between signs, and that the sign inspector's incorrect statement to Orsinger's regional lease manager about the Iliff sign did not estop the department from enforcing its spacing regulations against the Iliff sign. The hearing officer ordered Orsinger to remove the advertising devices within sixty days.

Pursuant to the State Administrative Procedure Act, § 24–4–105(15), 10 C.R.S. (1982), Orsinger appealed the decision of the hearing officer to the chief engineer of the department. In affirming the hearing officer's decision, the chief engineer ruled that the hearing officer's placement of the burden of proof on the department was harmless error, in that the department actually established that "its denial of the outdoor advertising sign permits was correct." The chief engineer also rejected Orsinger's estoppel claim with respect to the Iliff sign because Orsinger, with knowledge of the department's spacing regulation, had erected the sign structure and installed lighting for the structure before it ever inquired of the department whether a permit was necessary.[5]

Orsinger then filed in the Denver District Court an action for judicial review of the chief engineer's decision. The district court affirmed the order of the chief engineer, ruling as follows: the Outdoor Advertising Act and the department's regulations are reasonably related to legitimate governmental interests; Orsinger failed to establish that the department engaged in selective or discriminatory enforcement of its regulations against the Monaco and Iliff signs; the Outdoor Advertising Act vests the department with authority to promulgate regulations and the regulations promulgated by the department are within its rulemaking authority; the department properly interpreted and applied its regulations in denying Orsinger's applications for sign permits; the hearings before the hearing officer and the chief engineer were properly conducted; the department was not estopped from asserting that the Iliff sign violated the department's regulations; and the decision to deny Orsinger's applications for sign permits was not arbitrary or capricious, and was supported by ample evidence in the record. This appeal followed.

## II. Due Process of Law

We first address Orsinger's due process claim. Orsinger argues that the Outdoor Advertising Act and the department's spacing regulations violate due process of law under the United States and Colorado Constitutions, U.S. Const. amend. XIV; Colo. Const. art. II, § 25, because both the act and the regulations are not reasonably related to a legitimate governmental interest. We find this argument devoid of merit.

In enacting the Outdoor Advertising Act, the General Assembly expressly declared in section 43–1–402(1)(a), 17 C.R.S. (1984), that the act was necessary to further the following "substantial state interests":

(I) Protection of the public investment in the state highway system;

(II) Promotion of safety upon the state highway system;

(III) Promotion of the recreational value of public travel;

(IV) Promotion of public pride and spirit both on a statewide and local basis;

(V) Preservation and enhancement of the natural and scenic beauty of this state;

---

5. In his ruling, the chief engineer noted that each sign structure contained two signs, only one of which was visible from State Highway 83. The chief engineer modified the hearing officer's order to the extent of requiring Orsinger to remove only those signs visible from the state highway.

(VI) Broadening the economic well-being and general welfare by attracting to this state tourists and other travelers;

(VII) Providing the traveling public with information as to necessary goods and services in the immediate vicinity of the traveler;

(VIII) Protection and encouragement of local tourist-related businesses for the general economic well-being of the state;

(IX) Insuring that Colorado receives its full share of funds to be appropriated by the congress of the United States for expenditures on federal-aid highways.

Orsinger does not dispute the legitimacy of these interests, but rather claims that the act and the department's regulations are not reasonably related to the asserted interests of the state because the statute and regulations sweep too broadly in the following respects: in regulating signs that are neither oriented toward nor legible from state highways; in controlling the spacing of signs not simultaneously visible by an observer; and in drawing distinctions between sign-spacing standards for incorporated and unincorporated areas without considering the actual density factors, traffic patterns, or aesthetics in those respective areas.

 A regulatory scheme need not "allow all possible reasonable 'exceptions' to its application" in order to pass constitutional muster under due process analysis. *Chiappe v. State Personnel Board*, 622 P.2d 527, 532 (Colo.1981). On the contrary, a regulatory scheme of the type involved here is cloaked with a presumption of constitutionality, and the party challenging that scheme bears the burden of establishing its unconstitutionality beyond a reasonable doubt. *E.g., Pigg v. State Department of Highways*, 746 P.2d 961 (Colo. 1987); *Kibler v. State*, 718 P.2d 531 (Colo. 1986); *Colorado Auto and Truck Wreckers Association v. Department of Revenue*, 618 P.2d 646 (Colo.1980); *Lloyd A. Fry Roofing Company v. State Department of Health Air Pollution Variance Board*, 179 Colo. 223, 499 P.2d 1176 (1972). The rational nexus between the control of outdoor advertising signs and the govern-mental interests in promoting highway safety and in enhancing the recreational value of public travel, as well as preserving the natural and scenic beauty of the state, is all too obvious to warrant extended discussion. The deleterious effect of outdoor highway advertising on these interests does not disappear simply because an outdoor advertising sign adjacent to a state highway may not be specifically oriented toward or fully legible from the highway, or, for that matter, may not be so close to another sign as to render both signs *simultaneously* visible to an observer. Nor does the fact that regulations impose different spacing requirements for incorporated and unincorporated areas, without considering the actual density factors, traffic patterns, or aesthetics in those areas, add up to a due process infirmity.

 Regulatory classifications are not violative of due process simply because they are not drawn with mathematical precision or because they address some but not all aspects of a particular problem. *See, e.g., Collopy v. Wildlife Commission, Department of Natural Resources*, 625 P.2d 994, 1002 (Colo.1981); *Manor Vail Condominium Association v. Town of Vail*, 199 Colo. 62, 65–67, 604 P.2d 1168, 1171–72 (1980). It is a matter of common knowledge that an incorporated area of a city or village will generally be more densely populated than an unincorporated or rural area, will experience a higher density of traffic with a correspondingly greater need on the part of the traveling public for information about necessary goods and services in the vicinity, and will often be dealing with aesthetic considerations which are quite different from those of an unincorporated or rural area.

We conclude that the regulatory scheme for the control of outdoor advertising in areas adjacent to state highways bears a rational relationship to several of those governmental interests specifically mentioned in the Outdoor Advertising Act.

III. *Equal Protection of the Laws*

So far as we can determine, Orsinger's equal protection claim has two aspects to it: first, the difference in spacing require-

ments for signs in incorporated and unincorporated areas, and, second, the department's alleged discriminatory enforcement in denying permit applications for the Monaco and Iliff signs. We again find Orsinger's claim legally and factually deficient.

### A.

■ Where, as here, the regulatory scheme involves neither a fundamental right nor a suspect classification, the rational-basis standard of review is controlling in resolving an equal protection claim. That standard requires that a governmental classification be rationally founded on differences that are real in fact and be reasonably related to a legitimate state interest. *E.g., San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Hurricane v. Kanover, Ltd.,* 651 P.2d 1218 (Colo. 1982). We have pointed out in Part II some of the environmental and demographic differences between incorporated and unincorporated areas of a city or village. These differences are real in fact, and as we noted in rejecting Orsinger's due process claim, the different spacing requirements for signs in these respective areas are reasonably related to legitimate governmental interests.

### B.

■ The second aspect of Orsinger's equal protection claim rests on the assertion that the department enforced its regulation in a discriminatory manner in denying permits for the Monaco and Iliff signs. It is presumed that state officials perform their tasks in a regular manner, and the party asserting an equal protection claim of discriminatory enforcement bears the burden of rebutting that presumption. *Lloyd A. Fry Roofing Company v. State Department of Health Air Pollution Variance Board,* 191 Colo. 463, 475, 553 P.2d 800, 809 (1976). A claim of discriminatory enforcement must be supported by evidence which will permit a factfinder to reasonably conclude that the enforcement not only proceeded from an unjust and illegal discrimination between persons in similar circumstances but also that the discriminatory enforcement was intentionally or purposefully carried out. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed.2d 220 (1886); *May v. People,* 636 P.2d 672, 681–82 (Colo.1981); *Lloyd A. Fry Roofing Company,* 191 Colo. at 474–75, 553 P.2d at 809.

■ In the instant case, Orsinger's evidence consisted solely of the fact that the owner of signs in the area of the Monaco and Iliff signs escaped enforcement of the spacing regulations when that owner's signs were erected. No showing was made, however, that these signs were erected in violation of any regulation then in existence or, more importantly, that the department intentionally or purposefully carried out a program of discriminatory enforcement against Orsinger's signs. Orsinger's bald allegation of discriminatory enforcement, unsupported by adequate evidence, must accordingly be rejected.

### IV. *Unlawful Delegation of Legislative Authority*

■ Orsinger asserts that the Outdoor Advertising Act unlawfully delegates legislative authority to the department because the act lacks adequate standards to guide the exercise of the department's rulemaking authority. In analyzing Orsinger's claim we start with the basic proposition that the legislature may not delegate the power to make or define a law, but may delegate the power to promulgate rules and regulations to an administrative agency so long as it provides sufficient standards for rational and consistent rulemaking and adequate procedural safeguards for effective judicial review of administrative action. *Cottrell v. City & County of Denver,* 636 P.2d 703, 709 (Colo.1981);[6] *see*

---

6. We stated in *Cottrell v. City & County of Denver:*

> We now make explicit that the test is not simply whether the delegation is guided by standards, but whether there are sufficient

statutory standards and safeguards and administrative standards and safeguards, in combination, to protect against unnecessary and uncontrolled exercise of discretionary power. The guiding consideration is whether

*Elizondo v. State Department of Revenue*, 194 Colo. 113, 570 P.2d 518 (1977). The controlling consideration in resolving Orsinger's claim, therefore, is whether the legislative standards in the Outdoor Advertising Act are sufficient to ensure that the department's exercise of its rulemaking authority will be rational and consistent in the first instance and that subsequent judicial review of the department's administrative action is available and will be effective. *Id.* A review of the pertinent statutory scheme convinces us that Orsinger's unlawful delegation claim must fail.

### A.

In addition to the promotion and enhancement of the state's interests in highway safety and the recreational value of public travel, as well as the preservation of the natural and scenic beauty of the state, one of the primary purposes of the Outdoor Advertising Act is to make certain that Colorado receives its full share of federal-aid highway funds appropriated by the United States Congress. § 43–1–402(1)(a)(IX), 17 C.R.S. (1984); *Pigg*, 746 P.2d at 963. To further this and the other purposes of the act, section 43–1–402(1)(b), 17 C.R.S. (1984), expressly states that "it is the intent of the general assembly that Colorado comply with the federal 'Highway Beautification Act of 1965' and the rules and regulations adopted thereunder." In keeping with this expressed legis-

lative intent, section 43–1–415(3), 17 C.R.S. (1984), authorizes the department "to enter into agreements with the secretary of transportation of the United States to carry out the national policy concerning outdoor advertising adjacent to the interstate system and federal-aid primary highways and to accept any allotments of funds by the United States, or any department or agency thereof, appropriated in furtherance of federal-aid highway legislation." [7] Under the provisions of the Federal Highway Beautification Act of 1965, the failure of a state to comply with the provisions of any agreement with the United States Department of Transportation could result, at the discretion of the Secretary of Transportation, in a ten percent reduction in federal highway fund disbursements to the state. 23 U.S.C. § 131(b) (1982). Moreover, federal regulations require each state to ensure that signs comply with size, lighting, and spacing criteria contained in any such agreement. 23 C.F.R. § 750.705(b) (1987).

In addition to granting the department the authority to enter into agreements with the Department of Transportation with respect to outdoor highway advertising, the Outdoor Advertising Act authorizes the department to adopt regulations and standards necessary to carry out the provisions of the act including, but not limited to, "[r]egulations necessary to qualify the state for payments made available by congress to those states that meet federal standards of roadside advertising con-

---

these constraints are sufficient to insure that administrative action will be rational and consistent in the first instance and that subsequent judicial review of that action is available and will be effective. Therefore, the appropriate analysis is to determine first whether sufficient statutory standards or safeguards exist to fulfill these functions. Second, if those standards and safeguards are inadequate, it must be determined whether additional administrative standards and safeguards accomplish the necessary protection from arbitrary action.

636 P.2d at 709–10 (citations and footnote omitted). Because we find that the statutory standards and safeguards in the Outdoor Advertising Act and State Administrative Procedure Act are adequate to protect against the arbitrary exercise of administrative authority by the depart-

ment, we need not look to the availability of other standards or safeguards under the second level of analysis outlined in *Cottrell.*

7. The department, pursuant to its statutory authority, entered into an agreement with the United States Transportation Department in 1971. This agreement, which is part of the record in this case, applies to all signs located in a zoned industrial or commercial area and within 660 feet of the interstate highway system in Colorado. Section III(B) sets out the following spacing requirements for a "non-freeway federal-aid primary highway," such as State Highway 83: outside of incorporated villages and cities, no two signs shall be spaced less than 300 feet apart; and within incorporated villages and cities, no two signs shall be spaced less than 100 feet apart.

trol,"[8] and regulations necessary to control the erection and maintenance on all state highways of advertising devices located in areas zoned for industrial and commercial uses. § 43–1–415(1)(a) and (c), 17 C.R.S. (1984). In matters relating to the interpretation, administration, and application of the Outdoor Advertising Act, the General Assembly has expressly provided that "[n]othing in [the act] shall be construed to permit advertising devices to be erected or maintained which would disqualify the state for payments made available to those states which meet federal standards of roadside advertising control." § 43–1–415(2), 17 C.R.S. (1984).

### B.

The legislative standards in the Outdoor Advertising Act, in our view, are sufficient to ensure that the department will exercise its rulemaking authority in a rational and consistent manner. One of the primary purposes of the legislative delegation of rulemaking authority to the department is to preserve Colorado's eligibility for federal funding. The department's authority to promulgate regulations for advertising devices on state highways in areas zoned for industrial or commercial purposes, therefore, must be exercised in a manner consistent with the overriding legislative goal of preserving Colorado's continued eligibility to receive federal-aid highway funds. § 43–1–402(1)(a)(IX), 17 C.R.S. (1984). *See generally Pigg*, 746 P.2d at 963–64. Additional legislative direction for the department's exercise of its rulemaking authority is found in section 43–1–415(3), 17 C.R.S. (1984), which virtually prohibits the department from administering the act in a way that would disqualify Colorado from federal-aid highway funds. When considered in the context of the obvious statutory tie-in to national highway advertising policy and the additional legislative mandate to avoid disqualification of federal-aid highway funding, the Outdoor Advertising Act's authorization to the department to promulgate regulations "necessary" to accomplish the purposes of the act provides a sufficient standard for the department's valid exercise of its rulemaking authority. *See National Advertising Company v. Department of Highways*, 718 P.2d 1038, 1042 (Colo.1986); *Colorado Auto and Truck Wreckers Association*, 618 P.2d at 651–52.

Given the statutory standards for rulemaking in the Outdoor Advertising Act, coupled with the administrative procedures available to one who has been initially denied a sign permit,[9] we are satisfied that judicial review offers an effective remedy against the department's allegedly arbitrary interpretation or application of its regulations. We thus hold that the Outdoor Advertising Act does not unlawfully delegate legislative authority to the department.

### V. *The Spacing Regulations as Within the Department's Rulemaking Authority*

Orsinger next argues that, even if the Outdoor Advertising Act does not unlawfully delegate legislative authority to the department, the department's spacing regulations nonetheless exceed the department's authority under the act because the regulations apply to signs regardless of their visibility from state highways, regardless of whether they are simultaneously visible from the highway, and regardless of whether the signs were erected with an intent to advertise their content to highway travelers. We find this argument untenable.

---

**8.** Consistent with its 1971 agreement with the Department of Transportation and the rulemaking power granted to the department by the Outdoor Advertising Act, the department adopted spacing regulation 601–3(VII)(B)(3)(b), which prohibits any two signs from being spaced less than 300 feet apart outside of an incorporated area of a village or city and less than 100 feet apart within an incorporated village or city.

**9.** Section 43–1–412(2)(a) and (3), 17 C.R.S. (1984), authorizes a hearing on a permit application pursuant to the State Administrative Procedure Act, which in turn provides for further review of the administrative decision by the chief engineer of the department, § 24–4–105(15), 10 C.R.S. (1982 and 1987 Supp.), and then an action for judicial review of the chief engineer's decision in the district court, § 24–4–106(4), 10 C.R.S. (1982).

Orsinger's argument is partially refuted by the terms of the regulations themselves. The regulations are applicable to advertising devices on "all areas adjacent to the main-traveled ways of the State Highway System." 2 Colo.Code Regs. § 601–3(II) (1983). Consistent with the statutory definition in section 43–1–403(1), 17 C.R.S. (1984), the regulations define an "advertising device" as including any outdoor sign "designed, intended, or used to advertise or to give information in the nature of advertising and having the capacity of being *visible* from the travel way of any State Highway." 2 Colo.Code Regs. § 601–3(IV)(D) (1983) (emphasis added). An "area adjacent to the State Highway System" means an area *"visible* from the main-traveled way and within 660 feet of the nearest edge of the right-of-way," and also an area "beyond 660 feet outside of urban areas which have signs *visible* from the main-traveled way and erected with the purpose of their message being read from such main-traveled way." 2 Colo.Code Regs. § 601–3(IV)(E) (1983) (emphasis added). The plain terms of the regulations make clear that they are not intended to apply to signs which are not visible from state highways.

Moreover, the legitimate interests of the state in promoting public safety on the highways, in enhancing the recreational value of public travel, and in preserving the natural and scenic beauty of the state, *see* § 43–1–402(1)(a), 17 C.R.S. (1984), are not significantly less impaired by reason of the fact that advertising devices may not be placed so close to each other as to be simultaneously visible to a highway traveler.[10] So also, the impairment of these legitimate state interests does not turn on the intent or state of mind of the person erecting an advertising device.

Since, in our view, the spacing regulations are designed to effectuate the purposes of the Outdoor Advertising Act, they obviously are not in excess of the department's rulemaking authority under the statutory scheme.

## VI. *Department's Interpretation and Application of Regulation 601–3(X)(N)*

In claiming that the department incorrectly interpreted and applied the spacing regulations to the Monaco and Iliff signs, Orsinger raises two arguments: (1) the department construed its regulation 601–3(X)(N), 2 Colo.Code Regs. (1983), which deals with the measurement of distances between sign structures on the same side of the highway, in an unduly expansive manner; and (2) the department erred in applying the regulation to signs that were visible but not legible from a state highway. We reject Orsinger's arguments.

### A.

Regulation 601–3(X)(N), which is applicable to all signs visible from the state highway system, provides as follows:

> Distances between sign structures located on the same side of the highway shall be measured along the nearest edge of the pavement between points directly opposite the closest points of the signs to the highway.

As interpreted and applied by the department, the distance between signs visible and located on the same side of the highway is not measured "as the crow flies," but rather by projecting a line commencing at and perpendicular to the edge of the highway pavement and extending to that part of the sign closest to the highway, then by projecting a similar line to another sign in the area, and by measuring the distance between the lines at the edge of the highway pavement. The effect of this method of measurement is that two signs separated by an actual linear or aerial distance between them in excess of the regulatory minimum distance (*i.e.*, 100 feet apart for signs within incorporated villages and cities, and 300 feet apart for signs outside of incorporated villages and cities, 2 Colo.Code Regs. § 601–3(VII)(B)(3)(b) (1983)) may nonetheless violate the mini-

---

**10.** The record contains some evidence that each of Orsinger's signs was simultaneously visible with other signs in the area.

mum spacing requirements of the regulations.

 The source of regulation 601–3(X)(N) is the 1971 agreement between Colorado and the United States Department of Transportation, which contains language substantially identical to the regulation.[11] *See* note 7, *supra.* As pointed out previously, the Outdoor Advertising Act expressly authorizes the department to enter into this type of agreement with the federal government and to promulgate and enforce necessary rules, regulations, and standards to qualify Colorado for federal-aid highway funds. An administrative agency's construction of its own regulation is entitled to great weight especially when, as here, the regulation is promulgated pursuant to an explicit legislative grant of regulatory authority and the regulation is neither plainly erroneous nor internally inconsistent. *Van Pelt v. State Board for Community Colleges and Occupational Education,* 195 Colo. 316, 323, 577 P.2d 765, 770 (1978); *see generally* K. Davis, 2 Administrative Law Treatise § 7:22 (2d ed. 1979).

The department's construction of regulation 601–3(X)(N) is obviously calculated to prevent the erection of a series of staggered signs which, although separated by setbacks, appear to a highway traveler as a continuous mass. This construction, in our view, serves to effectuate the safety, recreational, and aesthetic interests which the General Assembly sought to achieve in enacting the Outdoor Advertising Act. § 43–1–402(1), 17 C.R.S. (1984); *see Turner Communications Corporation v. Georgia Department of Transportation,* 139 Ga. App. 436, 228 S.E.2d 399 (1976) (legislative purpose of restricting impact of advertising signs on highway travelers requires that measurement of spacing distance between

signs be made along the highway). We thus conclude that the department properly interpreted and applied regulation 601–3(X)(N) in measuring the distance between Orsinger's signs and other signs in the area.

### B.

 We need not long delay over Orsinger's claim that the department erred in applying regulation 601–3(X)(N) to signs visible but not legible from a state highway at a distance of up to 660 feet. "Visible" is defined in the Outdoor Advertising Act as "capable of being seen, *whether or not legible,* without visual aid by a person of normal acuity." § 43–1–403(17), 17 C.R.S. (1984) (emphasis added).[12] Even though the contents of an outdoor advertising sign might not be legible from the highway, the visibility of the sign nonetheless can adversely affect the the safety of highway travelers and the natural scenic beauty of the state, and, in that respect, undermine the express purposes of the Outdoor Advertising Act. *See* § 43–1–402(1)(a), 17 C.R.S. (1984). In short, the regulation of signs visible from state highways at a specified distance is clearly within the scope of the department's regulatory authority under the Outdoor Advertising Act, even though the contents of the signs might not be legible from that distance.

### VII. *The Burden of Proof*

 We next address Orsinger's claim that the hearing officer erred in imposing on Orsinger, rather than the department, the burden of proof with respect to the department's denial of Orsinger's permit applications. We conclude that any errors in this respect inured to Orsinger's benefit and must be deemed harmless.

11. The 1971 Agreement provides as follows:
 The minimum distance between structures shall be measured along the nearest edge of the pavement between points directly opposite the signs along each side of the highway and shall apply only to structures located on the same side of the highway.

12. The federal regulations promulgated in connection with the federal Highway Beautification Act of 1965 require the regulation of advertising

devices located within 660 feet of and visible from the roadway. 23 C.F.R. § 750.702. The federal regulation defines "visible" as "capable of being seen, whether or not readable, without visual aid by a person of normal visual acuity." *Id.* § 750.703(n). We note that there is considerable evidence in the record that each of Orsinger's signs was both visible and legible from State Highway 83.

The statutory scheme for adjudicating sign permit applications under the Outdoor Advertising Act contemplates that the burden should fall on the party seeking the permit application. Section 43–1–412, 17 C.R.S. (1984), states in pertinent part as follows:

> (2)(a) If no permit has been obtained for the advertising device ... the department shall give notice by certified mail to the owner of the property on which the advertising device is located informing said owner that the device is illegal and requiring him within sixty days of receipt of the notice to remove the device or have a permit obtained if such permit may be issued and advising him of the right to request the department to conduct a hearing.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) A request for a hearing shall be made in writing and must be received by the department no later than sixty days after receipt of notice. Such hearing shall be held pursuant to the "State Administrative Procedure Act."

The State Administrative Procedure Act states that, "[e]xcept as otherwise provided by statute, the proponent of an order shall have the burden of proof." § 24–4–105(7), 10 C.R.S. (1982). The "proponent" is that party who propounds or proposes something, Black's Law Dictionary 1097 (1976), and an "order" is "the whole or any part of the final disposition ... by any agency in any matter other than rule-making," § 24–4–102(10), 10 C.R.S. (1982).

■ When a party seeks a sign permit under the Outdoor Advertising Act, he is proposing to the department that a permit issue in accordance with the request filed with the department. If that initial request is denied and the party requests a hearing on the permit application, that party is proposing or seeking an order for the issuance of the permit. The applicant for a sign permit, therefore, bears the burden of establishing by a preponderance of evidence that all of the conditions for the permit have been satisfied. *See United States Steel Corporation v. Train*, 556 F.2d 822, 834 (7th Cir.1977); *Appalachian*

*Power Company v. Train*, 545 F.2d 1351, 1358 (4th Cir.1976); B. Schwartz, Administrative Law § 7.8 (2d ed. 1984).

In this case, the hearing officer initially determined that the burden of proof was on the department to establish that Orsinger's signs did not comply with departmental regulations. In his written decision, however, the hearing officer acknowledged that his initial determination concerning the burden of proof was incorrect and expressly ruled that, notwithstanding that error, the department nonetheless carried the burden and established that it properly denied Orsinger's permit applications. In reviewing the hearing officer's decision, the chief engineer of the department determined that, regardless of the hearing officer's improper assignment of the burden of proof to the department, the department carried its burden in proving that "its denial of the outdoor advertising sign permits was correct." The record thus demonstrates that the hearing officer's error in initially placing the burden of proof on the department was an error that inured to the benefit of Orsinger and, as such, must be disregarded as harmless. C.A.R. 35(e).

### VIII. *Estoppel*

■ Orsinger next contends that the department should be estopped from claiming that the Iliff sign was in violation of the spacing requirements of the regulations. Orsinger bases its claim on its asserted reliance on the statement of the department's sign inspector to Orsinger's regional lease manager in April 1982 that the distances between the Iliff sign and adjacent signs were in excess of 100 feet and that, consequently, the Iliff sign was permissible and Orsinger was entitled to a sign permit. We conclude that the record supports the determination of both the hearing officer and the chief engineer that the department was not estopped from enforcing its spacing requirement against the Iliff sign under the circumstances of this case.

Estoppel is an equitable doctrine utilized to prevent manifest injustice. The essence of an estoppel is justifiable reliance, with a concomitant substantial and detrimental

change in position as the result thereof, on conduct or statements made by the party against whom the estoppel is invoked, under circumstances where the party asserting the estoppel is ignorant of the true facts and the party against whom the estoppel is invoked knows the true facts and intends that its statements or conduct be acted on by the other party. *See Department of Health v. Donahue,* 690 P.2d 243 (Colo.1984); *Crawford v. McLaughlin,* 172 Colo. 366, 473 P.2d 725 (1970); *Franks v. City of Aurora,* 147 Colo. 25, 362 P.2d 561 (1961).

In the instant case, the record shows that Orsinger had already erected and electrified the Iliff sign structure before the department's sign inspector became aware of the sign and that the sign inspector, believing the Iliff sign to be within the municipal boundaries of Denver, gave an oral assurance to Orsinger's regional lease manager that the spacing between the Iliff and adjacent signs appeared to be permissible and that Orsinger should apply for a sign permit. The record further shows that Orsinger's regional lease manager was familiar with the roadside advertising spacing regulations, and that, at the time of his conversation with the sign inspector on April 8, 1982, he knew that the Iliff sign was located in unincorporated Arapahoe County.

Given the degree to which Orsinger had already changed its position prior to the sign inspector's statement to Orsinger's lease manager on April 8, 1982, and the extent to which Orsinger's lease manager was aware of the spacing regulations and that the Iliff sign was located in an unincorporated area of Arapahoe County, we conclude that the record adequately supports the hearing officer's and the chief engineer's resolution of Orsinger's estoppel claim.

### IX. *Judicial Review in the District Court*

Orsinger last argues that the district court erred in determining that the department's administrative action in denying the sign permit applications was arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record. We reject Orsinger's argument.

 The record of the administrative phase of this case clearly demonstrates that the Monaco and Iliff signs did not comply with the spacing requirements of the department. Since the record fails to furnish any basis to support a claim of arbitrary or capricious administrative action, an abuse of administrative discretion, or findings and conclusions unsupported by substantial evidence in the record, the district court properly affirmed the administrative decision denying Orsinger's permit applications.

The judgment is accordingly affirmed.